IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JACK H. REDWINE, )
Plaintiff, )
v. ) Case No. 10-0407-CV-W-SWH
SOUTHWEST TRUST COMPANY, N.A., )
Defendant. )

ORDER

I. BACKGROUND

On April 26, 2010, plaintiff, Jack H. Redwine (hereafter "Redwine"), filed a Complaint requesting a declaratory judgment against defendant, Southwest Trust Company, N.A. (hereafter "Southwest Trust"), seeking to establish that he is entitled to receive all of the funds in the Development Period Reserve Fund (hereafter "DPRF") pursuant to a Trust Indenture dated July 1, 2007. (Doc. #1, ¶ 35-36) Furthermore, Redwine seeks monetary damages under an action for money had and received under Missouri law as well as promissory estoppel. (Doc. #1, ¶ 23-34) In order to fully understand the arguments by the parties in support of and in opposition to summary judgment, a brief summary of the factual background is in order. A detailed set of undisputed facts is listed below in section III, *infra.*

Branson Commerce Park, LLC (hereafter "Branson Commerce Park") owned approximately 346 acres of land in Branson, Missouri which it intended to develop as a business and technology park and to offer single-family residential lots. (Court's Undisputed Fact Nos. 3, 4 & 5, *infra*) The Branson Commerce Park Community Improvement District (hereafter "the District"), consisting of the 346 acres owned by Branson Commerce Park, was formed by the City of Branson, Missouri, in

order to levy special assessments on the property to pay for public infrastructure improvements. (Court's Undisputed Fact Nos. 3 & 6, *infra*) Defendant, Southwest Trust, became the trustee under the Trust Indenture. (Court's Undisputed Fact No. 2, *infra*) At the time that the Trust Indenture became effective, Michael J. Duncan owned 20% of Branson Commerce Park and plaintiff, Jack Redwine, owned 5% of Branson Commerce Park, with the remaining balance owned by other individuals. (Court's Undisputed Fact No. 21, *infra*) In late 2007, the owners of Branson Commerce Park entered into an agreement in which Michael J. Duncan assumed 80% ownership of Branson Commerce Park, plaintiff, Jack Redwine, retained his 5% ownership in Branson Commerce Park and the balance was owned by other individuals. (Court's Undisputed Fact No. 22, *infra*) After nearly all of the public infrastructure improvements were finished, Branson Commerce Park ran into serious financial difficulty, which prompted the minority members of Branson Commerce Park to form a new company, BCP Land Company, L.L.C., (hereinafter "BCP Land Company") to purchase the property from Branson Commerce Park in hopes of protecting their investments. (Court's Undisputed Fact No. 25, *infra*) By written agreement dated May 13, 2009, Branson Commerce Park sold all of its right, title and interest in all of the Developer Owned Special Assessment Property to BCP Land Company. (Court's Undisputed Fact No. 37, *infra*) The matter before the Court involves a dispute between the parties concerning what effect the sale of the property from Branson Commerce Park to BCP Land Company had on Branson Commerce Park's, and thus Redwine's, right to be paid the money remaining in the DPRF fund at the time of this sale.[1]

On February 1, 2011, Redwine filed a motion for summary judgment and a separate

[1]In connection with the sale of the property, Branson Commerce Park assigned to plaintiff Redwine all of its right, title and interest in the funds held in the DPRF. (Court's Undisputed Fact No. 39)

memorandum of law in support of his motion for summary judgment. (Doc. #34 & #35) Redwine argues that the Trust Indenture, which is plain and unambiguous, requires the defendant to release the funds in the DPRF. (Doc. #35 at 13) In support of his argument, Redwine points to the language of Sections 406(c) and (e) of the Trust Indenture. (Doc. #35 at 14) Section 406(c) authorizes the reduction of the amount on deposit in the DPRF when, among other conditions, the Developer offers evidence of a transfer of "a portion of the Developer Owned Special Assessment Property to third parties not controlling, controlled by or under common control with the Developer . . . ." (Court's Undisputed Fact No. 20, *infra*) Section 406(e) allows for the release of all remaining amounts in the DPRF when, among other conditions, "the Developer has sold the last parcel of Developer Owned Special Assessment Property." (Court's Undisputed Fact No. 20, *infra*) Redwine argues that BCP Land Company is a separate legal entity that is not controlling, controlled by or under the common control of Branson Commerce Park. (Doc. #35 at 14-16) Redwine also argues that BCP Land Company is not an affiliate or a successor as contemplated by the definitional section of the Trust Indenture which defines Developer as "Branson Commerce Park, L.L.C., and affiliates or successors thereof." (Doc. #35 at 16-18; Trust Indenture, Doc. #35-2[2] at P000015)

Southwest Trust filed a cross-motion for summary judgment and a separate memorandum of law in support of the cross-motion and in opposition to Redwine's motion for summary judgment. (Doc. #37 & #38) In support of its motion, Southwest Trust argues that section 406 of the Trust Indenture should be read so as to include the definition of Developer set forth in the definition section of the Trust Indenture. (Doc. #38 at 18-22) Southwest Trust argues that BCP Land

[2]Both parties submitted the Trust Indenture as exhibits to their respective motions. (See Doc. #35-2 & #38-2)

Company is both an affiliate and a successor of Branson Commerce Park, as those terms are used in the Trust Indenture, and therefore, the prerequisites for the release of the funds in the DPRF, as set forth in Sections 406(c) or (e), have not been met. (Doc. #38 at 14-22)

## II. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514 (1986). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. In determining whether a fact is material, courts must determine what facts under the substantive claim are necessary to sustain the cause of action. Anderson, 477 U.S. at 248.

If the moving party has met their initial burden, then the burden shifts to the nonmoving party to produce specific evidence to demonstrate the existence of a "genuine issue for trial." Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." Mirax Chem. Prods. Corp. v. First

Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991).

In considering cross-motions for summary judgment, the standard described above does not change. Johnson v. Unum Life Ins. Co. of America, 2006 WL 2850557, at *2 (W.D. Mo. Sept 29, 2006). The court must evaluate each motion independently, "'taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Livingston v. South Dakota State Medical Holding Co., Inc., 411 F.Supp.2d 1161, 1163 (D. S.D. 2006) (quoting Heublein Inc. V. United States, 996 F.2d 1455, 1461 (2nd Cir. 1993)).

III. UNDISPUTED FACTS

The following facts are uncontroverted unless otherwise noted:

1. Plaintiff Redwine is an individual residing in Prairie Village. [Redwine Dep. at 4:10-11, Doc. #35-1] (Plaintiff's Uncontroverted Facts (hereafter "PUF") #1)

2. Defendant Southwest Trust is a national banking association and it is the trustee under the Trust Indenture, dated July 1, 2007, (hereafter "the Trust Indenture" with the Branson Commerce Park Community Improvement District (hereafter "the District"). [Complaint ¶4; Answer to Plaintiff's Complaint ¶¶2 and 4; McConnell Dep. 8:1-25, 9:2-13, Doc. #38-1; Trust Indenture at P000012, P000019, Doc. #35-2] (PUF #2 & Defendant's Uncontroverted Facts (hereafter "DUF") #1)

3. The District is a political subdivision of the State of Missouri created on or about September 11, 2006, by the City of Branson, Missouri pursuant to the Missouri Community Improvement District Act, §67.1401 et seq., RSMo. The District is compromised of approximately 346 acres of land in Branson, Missouri. [Complaint ¶¶5 & 6; Answer to Plaintiff's Complaint ¶¶5 & 6; Trust Indenture at P000012,

P000015, Doc. #35-2; Official Statement at P000357, Doc. #35-3] (PUF #3 & DUF #2 )

4. At the time the District was created, all of the property in the District was owned by Branson Commerce Park, LLC, a single-purpose Missouri Limited Liability Company that was formed in March of 2006 for the purpose of developing the property in the District for commercial and residential purposes. [Complaint ¶6; Official Statement at P000383, Doc. #35-3] (PUF #4 & DUF #3 & 7)

5. Branson Commerce Park intended to develop the property in the District as a business and technology park and to offer single-family residential lots. [Answer to Plaintiff's Complaint ¶6; Official Statement at P000357, P000386, Doc. #35-3] (PUF #5)

6. To finance the costs of the design and construction of the public infrastructure improvements (e.g. road, water, and wastewater improvements), on June 27, 2007, the District authorized the issuance of two bonds: $13,590,000 Branson Commerce Park Community Improvement District Special Assessment Bonds, Series 2007A, and $3,150,000 Branson Commerce Park Community Improvement District Subordinate Special Assessment Revenue Bonds, Series 2007B (hereafter, collectively, "the Bonds"). [Complaint ¶7; Answer to Plaintiff's Complaint ¶7; Official Statement at P000357, Doc. #35-3] (PUF #6 & DUF #4)

7. The terms of the Bonds and the Districts's obligations to the bondholders are set forth in the Trust Indenture. In general, the District acquires funds to pay interest and principal due under the Bonds to the bondholders by imposing Special

Assessments against the owners of the property in the District. [Complaint ¶8; Answer to Plaintiff's Complaint ¶8] (PUF #7 & DUF #5)

8. Security for the bonds in the Branson Commerce Park transaction was special assessments to be levied on real estate within the District along with other funds and accounts established under the Trust Indenture. The special assessments were to be used to pay off the interest and principal on the bonds. [McConnell Dep. 10:23 – 11:8, Doc. #38-1] (DUF #6)

9. As part of the bond issuance, Branson Commerce Park entered into a Guaranty of Construction Completion (relating to the Branson Commerce Park project) dated July 12, 2007. [Redwine Dep. 75:18-25, 76:1-12, Doc. #38-7; Guaranty of Construction Completion dated July 12, 2007, Doc. #38-5] (DUF #8)

10. By virtue of the Guaranty of Construction Completion, Branson Commerce Park guaranteed that it would "complete the construction of the CID Financed Public Infrastructure Improvements, the PBC Financed Public Infrastructure Improvements and the Developer Financed Public Infrastructure Improvements…in accordance with the applicable terms of the Commerce Park Master Development Agreement dated as of April 9, 2007, as amended by the First Amendment to Commerce Park Master Development Agreement dated as of April 3, 2007,…provided, however, that Developer's obligation to complete the Improvements is conditioned upon their being made available to Developer from the proceeds of the Bonds the amount of $13,000,000 for the purpose of paying or reimbursing costs related to (the Improvements)." [Guaranty of Construction Completion dated July 12, 2007, § 1(a),

Doc. #38-5] (DUF #9)

A. Relevant Terms of the Trust Indenture

11. Under Section 101 of the Trust Indenture, all property owned by the Developer on the date that Special Assessments are due and payable which is subject to Special Assessments is defined as the "Developer Owned Special Assessment Property." [Trust Indenture at P000015, Doc. #35-2] (PUF #8)

12. The term "Developer" is defined in Section 101 of the Trust Indenture to mean "Branson Commerce Park, L.L.C. and affiliated and successors thereof." "Affiliates" and "successors are not defined. [Complaint ¶16; Answer to Plaintiff's Complaint ¶16; Trust Indenture at P000015, Doc. #35-2] (PUF #9 & DUF #17)

13. Rick McConnell, the bond counsel who drafted the language in the Trust Indenture, testified that he intended that the terms "affiliate" and "successor" in the definition of "Developer" to have their ordinary English meanings. [McConnell Dep. 59:8-24, Doc. #35-12] (PUF #33)

14. As security for the payment of the Special Assessments on the Developer Owned Special Assessments Property, section 401(a) of the Trust Indenture established a Development Period Reserve Fund (hereafter "the DPRF") to be held by the Trustee in a separate account. [Complaint ¶9; Answer to Plaintiff's Complaint ¶9; Trust Indenture at P000032, Doc. #35-2] (PUF #10 & DUF #10)

15. As required by section 401(c) of the Trust Indenture, the Developer, Branson Commerce Park funded the DPRF by depositing with defendant Southwest Trust Company the amount of $1,424,768.75. [Complaint ¶10; Answer to Plaintiff's

Complaint ¶10; Trust Indenture at P000033, Doc. #35-2] (PUF #11 & DUF #11)

16. Under section 406(a) of the Trust Indenture, the funds in the DPRF "can only be used by the Trustee to pay Special Assessments on Developer Owned Special Assessment Property to the extent such Special Assessments are not paid when due." [Complaint ¶11; Answer to Plaintiff's Complaint ¶11; Trust Indenture at P000037, Doc. #35- 2] (PUF #12 & DUF #12)

17. Under the other provisions of Section 406, the trustee is required to use the monies in the DPRF to pay any defaulted special assessments on Special Assessment Property owned by the Developer ("Developer Owned Special Assessment Property") to the County Collector. The County Collector, in turn, would pay the monies into another separate fund held by the trustee in order to pay the interest and principal to the bondholders. [Complaint ¶12] (DUF #13)

18. In connection with the issuance of the Bonds under the Trust Indenture, the District entered into a Covenant to Replenish Development Period Reserve Fund and Guaranty Thereof, dated July 12, 2007, (hereafter "the Replenishment Covenant") with Branson Commerce Park and the original members of Branson Commerce Park including plaintiff Redwine and his wife. The Replenishment Covenant requires Branson Commerce Park to replenish the DPRF at any time that the trustee withdraws funds from the DPRF to pay the Collector for unpaid special assessments on Developer Owned Special Assessment Property. The individual parties to the Replenishment Covenant agreed therein to guaranty Branson Commerce Park's replenishment obligations (hereafter "the Replenishment Guaranty"). [Complaint

¶13; Covenant to Replenish DPRF and Guaranty dated June 12, 2007, Doc. #35-4] (PUF #13 & DUF #14)

19. Section 612 of the Trust Indenture requires the District to enforce the terms of the Replenishment Covenant against Branson Commerce Park and the individual guarantors. [Complaint ¶14] (DUF #15)

20. Under sections 406(c) and (e) of the Trust Indenture, the Trustee is required to proportionately release to the Developer monies in the DPRF when the Developer sells Developer Owned Special Assessment Property to "third parties not controlling, controlled by or under common control with the Developer," provided that all Special Assessments currently due and payable have been paid. When the last parcel of Developer Owned Special Assessment Property is sold, the Trustee is required to release all of the remaining funds in the DPRF to the Developer. [Complaint ¶15; Answer to Plaintiff's Complaint ¶15; Trust Indenture at P000037-38, Doc. #35- 2] (PUF #14 & DUF #16)

B. Sale of Branson Commerce Park from Branson Commerce Park to BCP Land Company

21. At the time that the Trust Indenture became effective, Michael J. Duncan owned 20% and plaintiff Redwine owned 5% of Branson Commerce Park with the balance owned by other persons. [Official Statement at P000384, Doc. #35-3] (PUF #15)

22. The composition of Branson Commerce Park later changed. In late 2007, Michael Duncan acquired an 80% membership stake in Branson Commerce Park. At the same time, Phil Lopez and Tim Jury also acquired membership interest in Branson Commerce Park (through their respective LLCs, Zepol Industries, LLC and

Jury Industries, LLC) with Lopez acquiring a 5% interest and Jury acquiring a 10% membership interest. [Redwine Dep. 9:6-9, Doc. #38-7; Lopez Dep. 74:4 – 75:3, Doc. #38-8; Letter from Michael J. Duncan to Phil Lopez, dated September 30, 2007, Doc. #38-9] (DUF #30)

23. At all relevant times during 2009, Mr. Duncan owned 80% of Branson Commerce Park with the remaining 20% minority membership interests being owned by the following persons:

| | |
|---|---|
| Jury Land & Energy, LLC | 10% |
| Jack H. Redwine, Trustee of the jack H. Redwine Trust | 5% |
| Zepol Industries, LLC | 5% |

(hereafter "the Minority Members"). [Redwine Dep. at 10:5-9, 44:5-25, 45:1-2, 90:10-14, Doc. #35-1; Membership Interest Purchase Agreement dated May 13, 2009, Doc. #35-5] (PUF #16)

24. Under the terms of the Branson Commerce Park's Operating Agreement, as the 80% supermajority member of the company, Michael J. Duncan had total control over the company. [Operating Agreement of Branson Commerce Park, LLC dated March 3, 2006 at P000995 and P000998, Doc. #35- 6] (PUF#17)

25. After nearly all of the public infrastructure improvements were finished, in 2009 Branson Commerce Park ran into serious financial difficulty and was unable to meet its obligations. Concerned that they could lose their entire investment in the project, the Minority Members of Branson Commerce Park decided to form a new entity and to purchase all of the property in the District, all of which was still owned by Branson Commerce Park. [Redwine Dep. at 24:5-15, Doc. #35-1] (PUF #18)

26. On May 12, 2009, the Minority Members of Branson Commerce Park, LLC formed a new entity, BCP Land Company, LLC, a Missouri limited liability company. [Articles of Organization of BCP Land Company, LLC, Doc. #35- 7] (PUF #19)

27. BCP Land Company was formed on May 12, 2009. Since its inception, the members and their ownership interests of BCP Land Company have been as follows:

| | |
|---|---|
| Jury Industries LLC | 33.33% |
| Jack H. Redwine, Trustee of the Jack H. Redwine Trust | 33.33% |
| Zepol Industries, LLC | 33.33% |

[Redwine Dep. 90:2-6, Doc. #35-1; Operating Agreement of BCP Land Company, LLC, Doc. #35-11; Lopez Dep. 25:22-25, 26:1-11, Doc. #38-8] (PUF #28 & DUF #37)

28. BCP Land Company is a separate legal entity from Branson Commerce Park. [Answer to Plaintiff's Complaint ¶ 22] (PUF #27)

29. Michael J. Duncan has never held a membership interest in BCP Land Company. [Redwine Dep. 90:7-9, Doc. #35-1] (PUF #29)

30. On May 13, 2009, Redwine, Jury and Lopez parted ways with Michael Duncan by virtue of a Business Separation Agreement. [Business Separation Agreement, Doc. #38-11] (DUF #38)

31. The Business Separation Agreement was part of the transaction that led to BCP Land Company acquiring the real estate of Commerce Park Branson from Branson Commerce Park. [Lopez Dep. 31:8-25, Doc. #38-8] (DUF #39 )

32. To effectuate the acquisition of the real estate of Branson Commerce Park, the members of Branson Commerce Park (Duncan, Redwine, Jury, and Lopez) all signed

a Unanimous Written Consent In Lieu Of A Special Joint Meeting Of The Members And Member Of The Board Of Managers of Branson Commerce Park, LLC dated May 13, 2009. [Unanimous Written Consent In Lieu Of A Special Joint Meeting Of The Members And Member Of The Board Of Managers of Branson Commerce Park, LLC dated May 13, 2009, Doc. #38-12; Lopez Dep. 27:22-25, 28:1-23, Doc. #38-8] (DUF #40)

33. The unanimous consent authorized Duncan as the manager of Branson Commerce Park on behalf of the company, to sell the real estate in Branson Commerce Park to BCP Land Company. The document is signed by Duncan, Redwine, Jury, and Lopez. [Unanimous Written Consent In Lieu Of A Special Joint Meeting Of The Members And Member Of The Board Of Managers of Branson Commerce Park, LLC dated May 13, 2009, Doc. #38-12] (DUF #41)

34. Likewise, the members of BCP Land Company (Redwine, Jury, and Lopez), on or about May 15, 2009, executed a Unanimous Written Consent In Lieu Of A Special Meeting Of The Members of BCP Land Co. authorizing attorney James C. Tilden, as the company's agent, to execute and deliver on behalf of BCP Land Company, the contract for the purchase of the real estate from Branson Commerce Park. [Unanimous Written Consent In Lieu Of A Special Meeting Of The Members of BCP Land Co., LLC, Doc. #38-13; Lopez Dep. 29:1 –25, 30:1-13, Doc. #38-8] (DUF #42)

35. Thus, Duncan, Redwine, Lopez and Jury authorized the sale of the real estate of Branson Commerce Park to an LLC owned by Jury, Lopez and Redwine. [Lopez

Dep. 95:6-25, 96:1-25, Doc. #38-8] (DUF #43)

36. On May 26, 2009, Michael J. Duncan acquired 100% of the membership interests of Branson Commerce Park. [Membership Interest Purchase Agreement dated May 13, 2009, Doc. #35-5] (PUF #30)

37. By written agreement dated May 13, 2009, Branson Commerce Park sold all of its right, title and interest in all of the Developer Owned Special Assessment Property to BCP Land Company. The transaction closed on May 26, 2009. [Contract for Sale and Purchase dated May 13, 2009, Doc. #35-9; Lopez Dep. 81:21-25, 82:1-9, Doc. #38-8] (PUF #20 & DUF #44)

38. As part of the sale transaction, BCP Land Company also paid the amount of $1,567,923.00, which was the full amount of the delinquent Special Assessments for the year 2008. [Answer to Plaintiff's Complaint ¶ 20] (PUF #21)

39. In connection with the sale of the property, Branson Commerce Park assigned to plaintiff Redwine all of its right, title and interest in the funds held in the DPRF (hereafter "the Assignment"). [Complaint ¶17; Assignment and Assumption Agreement dated May 26, 2009, Doc. #35-8] (PUF #22 & DUF #49)

C. <u>Request to Release Funds in the DPRF</u>

40. On May 28, 2009, plaintiff Redwine's counsel provided written notice to defendant Southwest Trust Company that Branson Commerce Park had sold all of the Developer Owned Special Assessment Property to BCP Land Company and that all currently due and owing Special Assessments had been paid in full. [Answer to Plaintiff's Complaint ¶ 20] (PUF #23)

41. Defendant Southwest Trust Company was further provided a copy of the Assignment in which Branson Commerce Park had assigned to Mr. Redwine all of its right, title and interest with respect to the DPRF, including the right to receive all distributions of the proceeds from the DPRF. [Complaint ¶19; Answer to Plaintiff's Complaint ¶ 19] (PUF #24 & DUF #62)

42. On July 7, 2009, plaintiff Redwine's counsel demanded that defendant Southwest Trust Company terminate the DPRF and release the funds in the DPRF to Mr. Redwine. [Complaint ¶21; Answer to Plaintiff's Complaint ¶ 21, Letter from James C. Tilden to S. Brent Varzaly dated July 7. 2009, Doc. #35-10; Redwine Dep. 61:2-11, attached as Doc. #38-7] (PUF #25 & DUF #63)

43. On August 21, 2009, defendant Southwest Trust Company rejected Redwine's demand to release the funds in the DPRF to plaintiff Redwine. [Answer to Plaintiff's Complaint ¶ 22; Redwine Dep. 67:4-9, Doc. #38-7; Letter from Adam M. LaBoda to James C. Tilden dated August 21, 2009, Doc. #38-21] (PUF #26 & DUF #64)

D. BCP Land Company Finishes the Project

Redwine has objected to over half of Southwest Trust's undisputed material facts on the grounds that those facts constitute inadmissible parol evidence, particularly those facts concerning the actions of the parties following the sale of Branson Commerce Park from Branson Commerce Park to BCP Land Company. ( See Doc. #41 at 1-2) In the Court's view, many of the facts to which plaintiff objected are immaterial to a resolution of the pending motions. However, for reasons set forth in Section IV. A., *infra*, of this Order, the Court concludes that the objected to facts on which it relies are not inadmissible parol evidence.

44. When BCP Land Company acquired the real estate in Branson Commerce Park, the Trustee still had approximately $755,000 remaining of the approximately $13,000,000 that had been set aside for infrastructure improvements, but more money was needed to finish the project because of cost overruns. [Lopez Dep. 11:1-19, Doc. #38-8] (DUF #50)

45. The project was not finished yet when BCP Land Company bought it. [Lopez Dep. 23:14-16, Doc. #38-8] (DUF #51)

46. When BCP Land Company bought the real estate, its first and principal order of business was to finish the project and make the land valuable for sale – which had previously been the goal of Branson Commerce Park. [Lopez Dep. 23:17-24, Doc. #38-8] (DUF #52)

47. Phil Lopez acted as the operations manager for BCP Land Company after the acquisition of the real estate. He worked with the City to finish the work on the project and with the contractors to get that work done. [Lopez Dep. 47:5-22, Doc. #38-8] (DUF #53)

48. Lopez's work was done both in his role as managing member of BCP Land Company and as executive director of the District, and it was the same type of work that had previously been done by Branson Commerce Park. [Lopez Dep. 47:13-25, 48:1-6, Doc. #38-8] (DUF #54)

49. BCP Land Company finished development of the Branson Commerce Park project. [Lopez Dep. 11:20-21, Doc. #38-8] (DUF #55)

50. With the development work complete, on May 12, 2010, BCP Land Company

dedicated the infrastructure to the City of Branson as contemplated by the original master agreement between the City of Branson and Branson Commerce Park. [Lopez Dep. 48:21-25, 49:1-25, 50:1, Doc. #38-8; News Release dated May 12, 2010, Doc. #17; Letter from the City of Branson to Phil Lopez dated May 11, 2010, Doc. #38-18] (DUF #56)

51. After BCP Land Company acquired the real estate in the District, it had the right to pick the board members and it replaced the board members who had previously been selected by Mr. Duncan. [Redwine Dep. 32:17-22, 33:7-10, Doc. #38-7] (DUF #57)

52. BCP Land Company provided no financing to Branson Commerce Park to complete its obligations to finish the work at Commerce Park Branson. In fact, Branson Commerce Park had no ongoing responsibilities with respect to the real estate in Branson Commerce Park after the May 13, 2009 sale of the real estate to BCP Land Company. [Lopez Dep. 83:1 –25, 84:1-25. 85:1-4, Doc. #38-8; Contract of Sale and Purchase dated May 13, 2009, Doc. #38-14] (DUF #58)

53. In fact, all of Branson Commerce Park's responsibilities for completing the project were taken over by BCP Land Company, including participation in the District. [Lopez Dep. 85:5-17, Doc. #38-8] (DUF #59)

54. On June 29, 2009, Phil Lopez sent the trustee a written request for disbursement from

the project account of the project fund. He did so in the course of finishing the project of Branson Commerce Park for BCP Land Company. In doing so, Lopez wrote, "The Developer's Written Request for Reimbursement or Payment No. 28

dated June 29, 2009 is hereby approved for payment." The "Developer" Lopez was referring to was BCP Land Company. [Lopez Dep. 92:22-25, 93:1-25, 94:1-20, Doc. #38-8; Written Request for Disbursement dated June 29, 2009, Doc. #38-19] (DUF #60)

55. BCP Land Company used all of the funds remaining for the project in the course of finishing the improvements on the real estate. [Lopez Dep. 92:22-25, 93:1-25, 57:18-25, 58:1-20, Doc. #38-8] (DUF # 61)

## IV. DISCUSSION

It is well established that the "cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995). In determining the intent of the parties, courts look to the whole document as opposed to individual portions. Missouri Consol. Health Care Plan v. BlueCross BlueShield of Missouri, 985 S.W.2d 903, 909 (Mo. App. W.D. 1999). Furthermore, "[e]ach provision is construed in harmony with the others to give each provision a reasonable meaning and avoid an interpretation that renders some provisions useless or redundant." Wildflower Community Ass'n, Inc. v. Rinderknecht, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000). Only if the language of a contract is ambiguous may courts look beyond the language of the contract in order to determine the intent of the parties. Ethridge v. TierOne Bank, 226 S.W.3d 127, 131 (Mo. 2007).

A contract is ambiguous when "its terms are susceptible to fair and honest differences." Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003). Such is the case "when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." Gulf Ins. Co. v. Noble Broadcast, 936 S.W.2d 810, 814 (Mo. 1997). Nevertheless, a contract is not

ambiguous just because the parties disagree as to the meaning of the terms. State ex rel. Vincent v. Schneider, 194 S.W.3d 853, 860 (Mo. 2006). Courts interpreting contracts look at the "plain and ordinary meaning of the words used, or the meaning that a person of average intelligence, knowledge, and experience would deem reasonable." Bailey v. Federated Mut. Ins. Co., 152 S.W.3d 355, 357 (Mo. App. W.D. 2004).

A. Parol evidence

Before addressing the claims of the parties, this Court must first address Redwine's assertion that portions of Southwest Trust's statement of undisputed facts "constitute inadmissible parole evidence that is outside the plain and unambiguous terms of the Trust Indenture." (Doc. #41 at 1-2) Parol evidence is a "substantive rule of contract law and exists to preserve the sanctity of written contracts." Kenney v. Vansittert, 277 S.W.3d 713, 719 (Mo. App. W.D. 2008). Where parties to a contract have expressed their agreement in writing, the intent of the parties is to be determined from within the four-corners of the document. Mid Rivers Mall, L.L.C. v. McManmon, 37 S.W.3d 253, 255 (Mo. App. E.D. 2000). Thus, "the parol evidence rule prohibits evidence of prior or contemporaneous oral agreements that vary or contradict the terms of an unambiguous, final, and complete writing." Poelker v. Jamison, 4 S.W.3d 611, 613 (Mo. App. E.D. 1999). Missouri courts have held that a court may "admit evidence of extrinsic facts and circumstances in order to clarify the nature of the agreement itself." Hardesty v. Mr. Cribbin's Old House, Inc., 679 S.W.2d 343, 346 (Mo. App. E.D. 1984); see also Wheelhouse Marina Real Estate, L.L.C. v. Bommarito, 284 S.W.3d 761, 770 (Mo. App. S.D. 2009).

This Court finds that the objected to facts that have been included in this Order are not

inadmissible parol evidence[3]. The facts do not contradict or vary the terms of the Trust Indenture. To the contrary, the facts that have been included in this Order describe either the ownership interest in Branson Commerce Park or the conduct of BCP Land Company after its purchase of the real estate in the District. The meaning of the term successor can be determined from the plain language of the document, without resort to extrinsic evidence. The conduct of BCP Land Company, after the May 2009, sale of the property, merely demonstrates that its actions were fully consistent with the term successors as set forth in the Trust Indenture. Therefore, the objected to facts, which the Court has determined are material to a decision on the summary judgement motions, are not inadmissible parole evidence.

Redwine has not otherwise contested Southwest Trust's statement of uncontroverted facts. Local Rule 56.1(a) expressly states that:

> Each fact in dispute shall be set forth in a separate paragraph, shall refer specifically to those portions of the record upon which the opposing party relies, and, if applicable, shall state the paragraph number in movant's listing of facts that is disputed. All facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party.

Therefore, Redwine is deemed to have admitted Defendant's Undisputed Material Fact Nos. 30 and 55-61. See generally Ruby v. Springfield R-12 Public School Dist., 76 F.3d 909, 911 n.6 (8th Cir. 1996) (discussing the older version of local rule regarding summary judgment motions).

B. Redwine's claim that Branson Commerce Park is not a third party that is "not

[3]Plaintiff admitted Defendant's Statement of Undisputed Material Fact Nos. 1-17; 37-44; 49 and 62-64. The remaining facts were disputed on that basis that they constituted inadmissible parole evidence. The Court has relied on only a portion of the allegedly disputed facts. The Court's Undisputed Fact Nos. 22 and 44-55, *supra*, are taken from Defendant's Statement of Undisputed Material Fact Nos. 30 and 55-61.

controlling, controlled by or under common control of the Developer"

In attempting to show that he is entitled to receive the funds in the DPRF, Redwine argues that Sections 406(c) and/or (e) of the Trust Indenture control whether the funds should be released. (Doc. #35 at 14-16) Specifically, Redwine argues that in order for the funds to be released, the Developer must show that the property was transferred to "third parties not controlling, controlled by or under common control with the Developer . . . ." (Doc. #35 at 14) Redwine argues that BCP Land Company was an independent legal entity that was not "controlling, controlled by or under common control of" Branson Commerce Park, and thus, the transfer of the property to BCP Land Company meets the test for release of the funds in the DPRF under either Sections 406(c) or (e) of the Trust Indenture. (Doc. #35 at 14-15)

The relevant portion of Section 406(c) of the Trust Indenture states:

> The amount on deposit in the Development Period Reserve Fund will be reduced on or after June 2 of each year if and to the extent that (a) the Developer provides the Trustee with documents evidencing that the Developer has transferred a portion of the Developer Owned Special Assessment Property to third parties not controlling, controlled by or under common control with the developer, and (b) the District gives the Trustee written notice that all Special Assessments, penalties and/or interest on said parcel, if any, currently due and payable on such property have been paid through the date of the proposed reduction.

(Trust Indenture at P000037, Doc. #35-2) Similarly, Section 406(e) of the Trust Indenture provides:

> All amounts remaining in the Development Reserve Fund will be released to the Developer on the date the Developer and the District have given the Trustee written notice that (I) the Developer has sold the last parcel of Developer Owned Special Assessment Property, and (ii) all Special Assessments, penalties and/or interest on all Developer Owned Special Assessment Property currently due and payable have been paid.

(Trust Indenture P000038, Doc.# 35-2)

Southwest Trust argues that in addition to the above provisions, this Court must also look to the definition of Developer found in the Trust Indenture. (Doc. #38 at 15) The Trust Indenture defines Developer as "Branson Commerce Park, L.L.C., and affiliates or successors thereof." (Trust Indenture at P000015, Doc. #35-2) Southwest Trust argues that BCP Land Company constitutes either, or both, an affiliate or successor of Branson Commerce Park, and therefore, the requirements of Sections 406(c) and (e) have not been satisfied. (Doc. #38 at 15-22) In response, Redwine argues that because Section 406 is a specific provision it should prevail over the more general definitional section. (Doc. #41 at 5)

Redwine's claim that Sections 406(c) and (e) should prevail over the general definition section is misplaced. While it is true that there are times when a specific provision in a contract controls over a general provision, that is true only when the provisions are in conflict or are inconsistent. A & L Holding Co. v. Southern Pacific Bank, 34 S.W.3d 415, 418-19 (Mo. App. W.D. 2000). Nothing about Sections 406(c) and (e) and the definition of Developer in the general definitional section of the Trust Indenture is inconsistent or in conflict, and thus, these sections should be read together. When read together, the relevant Section of 406(c) would provide:

> The amount on deposit in the Development Period Reserve Fund will be reduced on or after June 2 of each year if and to the extent that (a) the Developer [Branson Commerce Park, L.L.C., and affiliates or successors thereof] provides the Trustee with documents evidencing that the Developer [Branson Commerce Park, L.L.C., and affiliates or successors thereof] has transferred a portion of the Developer Owned Special Assessment Property to third parties not controlling, controlled by or under common control with the Developer [Branson Commerce Park, L.L.C., and affiliates or successors thereof], and (b) the District gives the Trustee written notice that all Special Assessments, penalties and/or interest on said parcel, if any, currently due and payable on such property have been paid through the date of the proposed reduction.

(Trust Indenture at P000037, Doc. #35-2) Section 406(e) of the Trust Indenture can be read similarly. Reading Sections 406(c) and (e) together with the definition of Developer in the Trust Indenture demonstrates that the issue before the Court is not whether BCP Land Company was "controlling, controlled by or under common control" of Branson Commerce Park, but instead whether BCP Land Company is an affiliate or successor of Branson Commerce Park.

C. What constitutes a successor to the Developer

Both parties agree that the term successor is not further defined in the Trust Indenture. (Doc. #35 at 16; Doc. #38 at 15) Similarly, both parties agree that when a term is not defined, courts should use the common and ordinary meaning of the term. (Doc. #35 at 16; Doc. #38 at 16); Transit Cas. Co. In Receivership v. Certain Underwriters at Lloyd's of London, 963 S.W.2d 392, 397 (Mo. App. W.D. 1998). Finally, both parties look to dictionaries, albeit different dictionaries, to determine the meaning of the term successor. (Doc. #35 at 17; Doc. #38 at 18)

Redwine points to a United States District Court, Eastern District of Missouri case that uses the definition of successor found in Black's Law Dictionary, 6th edition, which defines successor "with reference to corporations to mean 'another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of first corporation.'" (Doc. #35 at 17); U.S. v. Findett Corp., 75 F.Supp.2d 982, 989 (E.D.Mo. 1999) (quoting Black's Law Dictionary, 1431 (6th ed. 1990)). According to Redwine, BCP Land Company did not enter into a merger, consolidation, amalgamation or other legal succession with Branson Commerce Park and therefore cannot be a successor. (Doc. #35 at 17) In reviewing the most recent edition of Black's Law Dictionary, this Court finds two possible meanings of successor:

> 1. A person who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor. 2. A corporation that, through

amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation.

Black's Law Dictionary 1569 (9th ed. 2009).

Southwest Trust, on the other hand, proposes that this Court utilize the American Heritage Dictionary's definition of successor. (Doc. #38 at 18) There, successor is defined as "[o]ne that succeeds another." American Heritage Dictionary (4th ed. 2000). The American Heritage Dictionary further defines succeeds as "1. To come after in time or order; follow. 2. To come after and take the place of." American Heritage Dictionary (4th ed. 2000). Southwest Trust also claims that Redwine's narrow definition of successor has its root in corporate liability cases defining a successor-in-interest and has no place in defining the terms of the Trust Indenture. (Doc. #38 at 16)

Both the Black's Law Dictionary and the American Heritage Dictionary agree that a successor is one who takes the place of another. Black's Law Dictionary 1569 (9th ed. 2009); American Heritage Dictionary (4th ed. 2000). This is the common meaning of the term successor, and thus, the meaning that should be given to the term as it is used in the Trust Indenture. BCP Land Company followed Branson Commerce Park as owner of the property, which at the time of the sale had not been completely developed, and took the place of Branson Commerce Park. Therefore, BCP Land Company is a successor to Branson Commerce Park.

It is undisputed that upon purchasing the property in the District, BCP Land Company performed all the functions of a developer. At the time BCP Land Company purchased the real estate in the District, the project was not yet finished. (Court's Undisputed Fact No. 44, *supra*) After BCP Land Company purchased the property, BCP Land Company finished the development of the project, and the infrastructure was dedicated to the City of Branson as contemplated in the

original master agreement. (Court's Undisputed Fact No. 48 & 49, *supra*) In fact, within two months of buying the property, a written request for reimbursement relating to the project which referenced the Developer's request for reimbursement was submitted to Southwest Trust. (Court's Undisputed Fact No. 53, *supra*) The individual signing the document was Phil Lopez who was a member of BCP Land Company and was acting as operations manager on the project.[4] (Court's Undisputed Fact Nos. 33 & 46, *supra*) Additionally, BCP Land Company utilized all the remaining funds to finish improvements on the property. (Court's Undisputed Fact No. 55, *supra*) Thus, BCP Land Company acted as though it was the Developer. This Court is in no way using this information to create an ambiguity or "show an obligation other than expressed in the written instrument." (Doc. #41 at 5) Instead, facts about BCP Land Company's post-purchase actions are being utilized to show that BCP Land Company acted as a successor as that term is commonly defined by taking the place of the original developer, Branson Commerce Park.

Missouri courts have routinely used dictionary definitions when interpreting the terms of a contract. Bailey, 152 S.W.3d at 357. However, in so doing, courts must be mindful to look at the "object, nature and purpose of the agreement" in determining the meaning of the terms found within the agreement. Wilshire Const. Co. v. Union Elec. Co., 463 S.W.2d 903, 906 (Mo. 1971). Thus, the entire agreement will set the stage for how a specific term is defined.[5] Reading the Trust

---

[4] The written request was submitted by the District. However, when BCP Land Company purchased the property in the District, BCP Land Company had the right, and asserted the right, to select the board members of the District. (Court's Undisputed Fact No.50, *supra*) Additionally, Phil Lopez served as the executive director for the District. (Court's Undisputed Fact No. 47, *supra*)

[5] The bond transaction in this case involved numerous documents of which the Trust Indenture is only one. Portions of these documents are attached to the parties' pleadings, see e.g. Doc. #38-4, #38-5, #38-6. A summary of the transaction in its entirety is contained in the Official Statement portions of which were attached by the parties as Doc. #35-3 and Doc. #38-3.

Indenture as a whole, it is clear that the DPRF was set up to protect the District in case the Developer failed to make the required special assessment payments on the property. (See generally Trust Indenture, Doc. #35-2[6]) If this Court were to adopt Redwine's interpretation of the meaning of the Trust Indenture, the protection afforded the District by Section 406 of the Trust Indenture would be illusory. Under Redwine's interpretation, the developer could simply sell all of the property to a new company and, as long as the special assessments were current at the time of this sale, claim any funds remaining in the DPRF. At this point the DPRF would be at an end along with the requirement for the developer and the guarantors to replenish the DPRF.[7] The Official Statement clearly sets forth the purpose of the DPRF, which is to:

> provide the Developer with a financial incentive to diligently pursue the sales of the Branson Commerce Park property, to pay Special Assessments on Developer Owned Special Assessment Property (defined in the Indenture as property owned by the Developer or by third parties controlling, controlled by or under common control with the Developer on the date on which Special Assessments are due and payable, which is subject to the Special Assessments) and to complete the CID Financed Public Infrastructure Improvements. . . .

(Doc. #38-3 at P000376) Other documents submitted by the parties in support of the motions, such as the Covenant to Replenish Development Period Reserve Fund and Guaranty Thereof, also set forth the purpose the DPRF as to induce the District to issue the Bonds and provide funding for the CID Financed Public Infrastructure Improvements. (See Doc. #35-4 at P001129)

---

[6] See also the Covenant to Replenish Development Period Reserve Fund and Guaranty Thereof, which states in relevant part: "10. This Covenant and Guaranty is solely for the benefit of the District and is not intended to nor shall it be deemed to be for the benefit of any other third party, including the City." (Doc. #35-4 at P001131)

[7] The developer's and guarantor's liability under the Replenishment covenant was intended to "continue until (a) there ceases to be any Developer Owned Special Assessment Property, and (b) all annual Special Assessments with respect to Developer Owned Special Assessment Property have been paid in full." (Covenant to Replenish Development Period Reserve Fund and Guaranty Thereof at P001130, Doc. #35-4)

Missouri courts will reject an "interpretation of a contract that creates unreasonable results, when a more probable and reasonable construction can be adopted . . . ." Dwyer v. Unit Power, Inc., 965 S.W.2d 301, 307 (Mo. App. E.D. 1998) (quoting CB Commercial Real Estate Group, Inc. v. Equity Partnerships Corp., 917 S.W.2d 641, 647 (Mo. App. W.D. 1996). The DPRF was set up to protect the District in case the Developer failed to make the required special assessment payments on the property. Southwest Trust's interpretation of the Trust Indenture is consistent with the plain language of the document as well as the purpose for which the DPRF was established.

For the reasons discussed above, the Court finds that BCP Land Company was a successor to Branson Commerce Park, thus, there is no need to determine whether BCP Land Company was also an "affiliate" of Branson Commerce Park. As a successor to Branson Commerce Park, BCP Land Company took the place of the original developer, Branson Commerce Park. Because the property was sold to a successor of the developer, the requirements of Sections 406(c) and (e) of the Trust Indenture were not satisfied. Therefore, Mr. Redwine is not entitled to the money remaining in the DPRF as of the date of the sale of the property in May of 2009.

## V. CONCLUSION

For the reasons outlines above, it is

ORDERED that plaintiff's motion for summary judgment (Doc. #34) is DENIED. It is further

ORDERED that defendant's motion for summary judgment (Doc. #37) is GRANTED.

*/s/ Sarah W. Hays*
SARAH W. HAYS

UNITED STATES MAGISTRATE JUDGE